## APPEAL OF THE PENNSYLVANIA R. CO.

APPEAL FROM THE COURT OF COMMON PLEAS, NO. 4, OF
PHILADELPHIA COUNTY

Argued March 28, 1887—Decided April 11, 1887.

In a proceeding by bill in equity to have ascertained and defined the mode of crossing of one railroad by another under § 2 of act of June 19, 1871, P. L. 1360, it was reported *by the Master:*

1. That it was competent for each company to call upon the other to show at least a *prima facie* right and authority to construct and maintain its line at the points where they came in contact.

2. That a railroad company incorporated under the act of April 4, 1868, P. L. 62, may lawfully under § 9 of said act construct a branch to its main line before its main line has yet been completed.

3. That in the articles of association of a company, incorporated under said act, the North terminus being fixed at a point near the intersection of 20th street with the P. & R. R. on Pennsylvania avenue; in the route first approved by the directors it was at a point on said avenue between 20th and 21st streets; and in that finally adopted by the company and consented to by the city of Philadelphia, it was at the point of intersection of said avenue and 25th street; the terminus in each being upon the P. & R. R., which was plainly the objective point; in such case the line as so adopted was not unauthorized on account of the alleged variance.

4. That, considering the nature and character of the locality of the plaintiff's proposed road and of its probable business; the cost and expense of building the road overhead or underground at the points of intersection, as compared with the cost of grade crossings, and the practicability of successfully operating a road so raised or depressed; the nature and extent of the injury which will be inflicted upon defendant in the way of interference with the operation of its road by grade crossings, and the effect upon the safety and convenience of the public of grade crossings, under the circumstances it was not reasonably practicable for the plaintiff to avoid crossing defendant's road at grade.

*Held,* that an examination of the evidence fails to convict the Master of error in his conclusions.

Before MERCUR, C. J., TRUNKEY, GREEN and CLARK, JJ.; GORDON, PAXSON and STERRETT, JJ., absent.

No. 262 January Term 1887, Sup. Ct.; Court below, No. 1069 June Term 1885, C. P.

This was a bill in equity in the Court of Common Pleas No.

4, Philadelphia county, to enable the Schuykill River East Side R. Co. (controlled by the Balt. & Phila. R. Co.) to make four crossings at grade over the Delaware Extension of the Pennsylvania R. Co., in the city of Philadelphia.

The bill averred:—

1. That the plaintiff was duly incorporated under the act of April 4, 1868, P. L. 62, entitled An act to authorize the formation and regulation of railroad corporations, with power to locate, construct, maintain, and operate a railroad extending "from a point near the intersection of Twentieth street and Pennsylvania avenue in the Fifteenth ward, of the city of Philadelphia, to a point in the Twenty-seventh ward, of the city of Philadelphia, near the intersection of Fifty-third street and Bartram avenue," all in the city of Philadelphia, and to construct branches from its main line as provided in said statute.

2. That on July 3, 1885, an ordinance of councils was passed authorizing the construction of said line and a branch through that portion of the city known as "The Neck," and to enter upon and occupy certain streets in said city.

3, 4. That said branch line was located in accordance with the provisions of said ordinance, and the construction thereof commenced, said branch commencing at a point on plaintiff's main line near Schuylkill avenue and Dickinson street, in the Twenty-sixth ward of said city, and extending by way of Schuylkill avenue, Wolf street, Twenty-third street, Oregon avenue, and Meadow street to the Delaware river, in the First ward of said city; and that it has procured the right of way for almost the entire length of said branch railroad, and has purchased extensive terminal properties upon the Delaware river at Snyder street and Dickinson street, and that a considerable portion of the said line has been graded and is ready to receive the superstructure of said railroad.

9. That said branch railroad, as located, crosses the line of the railroad constructed, maintained and operated by the defendant in the Neck at grade at four points, to wit, at the intersection of Twenty-ninth and Wolf streets; at the intersection of Twenty-fifth and Wolf streets; at the intersection of Oregon avenue and Swanson street, and at the intersection of Commercial avenue and Meadow street.

Abstract of Bill.

10. That it is not reasonably practicable for the plaintiff to build its said branch railroad so as to avoid crossing the said railroad of the defendant in the Neck at the four points specified at grade.

That the purposes sought to be accomplished by the plaintiff, in building said branch road, are to reach the terminal properties which it has acquired on the Delaware river, and to make railroad connections with the various business establishments located along its route in that portion of the city. That the property owners along its route, in consideration of the facilities for connection therewith, offered by a road constructed in conformity with plaintiff's plan at grade, have granted to the plaintiff the right of way "without any or for a decreased charge."

That "it would be utterly impracticable to cross the tracks of the defendant at any one of the said points by passing underneath the same; and an elevation of plaintiff's railroad along its entire route or at any of said points so as to pass the railroad of the defendant overhead would be unreasonably expensive and make it of no practicable use or benefit whatever."

11. That at the time of the location of the road of the plaintiff upon the ground, the defendant had constructed and was operating its road; its two tracks at the point of crossing on Commercial avenue occupied only about twenty and a half feet; at the point of crossing on Swanson street it had one track only, which is at about seven and a quarter feet below the confirmed grade of said street; at the point of crossing upon Twenty-fifth street it had two tracks at about the confirmed grade of said street; and at the point of crossing on Twenty-ninth street it had only one track, also at about the confirmed city grade.

12. That immediately upon the location of the plaintiff's branch road the defendant made a number of changes in the location and grade of its railroad, which the plaintiff avers was done simply to defeat and interfere with its right to cross the same. At the point of crossing on Commercial avenue it shifted one of its original tracks and laid three additional tracks, no two of the additional tracks being of the same grade, the five tracks occupying a total width of about sixty feet within the lines of Commercial avenue. At the point of crossing on

Abstract of Bill.

Swanson street it deflected its original track from its old position and has laid two additional tracks each at different grades, varying as much as four feet between them. At the point of crossing at Twenty-fifth street it has laid one additional track between the two original tracks, without connecting the same at either end with the original tracks; and at the point of crossing at Twenty-ninth street it has laid two additional tracks, one above and the other below the confirmed grade of the street, said tracks varying in grade as much as five feet between them, and neither connecting with the original tracks.

13. That plaintiff applied to the defendant to permit it to cross its railroad at the four several points in the manner aforesaid, but the defendant refused to consent thereto, and has heretofore prevented such crossings to be peaceably made.

14. That the plaintiff tendered a bond to the defendant in the matter of each of said crossings, conditioned for the payment of such damages as the defendant should sustain by reason of the respective grade crossings, but that the defendant refused to accept the same, and petitions were thereafter presented to the Court of Common Pleas of this county by the plaintiff, praying for the approval of said bonds. The defendant filed exceptions to said petition, and, *inter alia*, averred that it was reasonably practicable for the plaintiff to avoid said grade crossings by elevating the grade of its railroad so as to pass the defendant's road overhead at all of said points, and orders were made by the court withholding the approval of said bonds until the question whether the defendant should be permitted to cross at grade should be determined.

5, 6, 7, 8. The plaintiff further avers that the defendant's said line of railroad in the Neck, which is known as its Delaware Extension, extending from a point near the western end of the bridge over the Schuylkill river, known as the Arsenal bridge, to the Delaware river at Greenwich Point, and three connections therewith, one running from a point thereon at Twenty-fifth and McKean streets to the Philadelphia Gas Works at Point Breeze, another from another point thereon, near Swanson street, running northward upon and within the lines of said Swanson street to the intersection of Morris street and Commercial avenue, is not authorized by law, and is therefore unlawfully maintained and operated by the defendant.

And relief was prayed for as follows:—

1. That an injunction be issued restraining the defendant from obstructing or interfering with the plaintiff in the construction of its said road crossing the defendant's road at grade at the point specified; and

2. That a decree be made that it is not reasonably practicable for defendant to avoid said grade crossings; and

3. Further, that the court prescribe such regulations as are usual and proper in such cases for the operation of the said crossings and the conduct of the business of the plaintiff and defendant respectively in the use of their railroads upon approaching and passing the said grade crossings; and

4. Such other and further relief as may be required.

The answer of the defendant averred:—

1. That it was true the complainant company was incorporated under the act of April 4, 1868, as stated in the bill; that the respondent was advised that under said act the authority to construct a main line and branches are two distinct subjects, and the latter cannot be constructed until after the completion of the main line.

2. That it was true that an ordinance was passed, approved July 3, 1885 (and this ordinance was copied in full).

That said ordinance was wholly invalid and by reason thereof vests no valid authority to construct said branch road in said complainant. In support thereof this respondent showeth, that by the act of May 23, 1874, P. L. 231, dividing all the cities of this state into three classes and regulating the passage of ordinances thereby, the legislative power of every city is vested in the councils thereof; and it is further by said statute enacted in § 3 thereof, that no ordinance shall be passed by or through the councils of any city except by bill, and that no bill shall be passed containing more than one subject, which shall be clearly expressed in its title. And this respondent is advised that the aforesaid bill or ordinance, as passed, contains more than one subject, and that some subjects contained therein are not clearly expressed, or indeed alluded to, in its title: in that—

A. The construction of a railroad as a main line and the construction of a branch road from the main line of a railroad

are two different subjects and cannot be contained in the same ordinance.

B. That said ordinance provides by sections 1, 6 and 7 thereof that the said Schuylkill River East Side Railroad Company may enter upon and occupy, either by crossing the same or otherwise, certain streets, lanes and alleys, the consent to which occupation constitutes one subject thereof, and the only one expressed in its title.

C. The same ordinance further provides: " Whereas the said railroad company proposes upon the passage of this ordinance to locate its bridge over the river Schuylkill at a point at least fifteen hundred feet south of Gray's Ferry Bridge," that " the bridge over the river Schuylkill shall be constructed at the place shown upon the said plan " (which is a plan required by section 16 of said bill to be filed by the City Solicitor), " with two draw openings, one upon each side of the center pier, of seventy-five feet clear waterway between the draw pier and each of the two adjoining piers." And the subject of said bridge or of its location or erection is not expressed, or indeed alluded to, in said title.

D. The said ordinance by section 5 thereof ordains " that the Department of Surveys be and it is hereby authorized and directed to place upon the plans of the city Pennsylvania avenue, with an increased width upon its northeast line of forty-three feet between Twenty-fifth and Twenty-eighth streets, and of an increased width upon the said northeast line of thirty-three feet from Twenty-eighth street to Poplar street." And the widening of an existing street within the limits of the city constitutes another and separate subject from those hereinabove mentioned, and it is not expressed in its title.

E. The said ordinance by section 8 thereof ordains that " the consent of the said city is hereby given to the occupation of such portion of the properties of the Philadelphia Gas Works, between Chestnut and Filbert streets, in the Ninth ward, and between Twenty-fourth and Twenty-fifth streets, on Callowhill street, as is covered by the location of said railroad through the same, and which is shown upon the plan aforesaid."

F. That the main line of railroad described in said ordinance

differs in material respect from the line authorized to be con-structed by the charter of the plaintiff company, the termini of which are given in the first paragraph of plaintiff's bill. The eastern terminus of the road described in said ordinance is a distance of about one mile from the eastern terminus fixed in said charter, the intervening distance being a thickly built up and populated portion of the city of Philadelphia. The entire route of said railroad as fixed in said charter is but about three miles in length; and its whole line is through said city. Inasmuch as the said charter without said ordinance, as well as said ordinance without said charter, is incompetent to authorize the construction of plaintiff's main line of rail-road through the city, there could be no authorized branch.

5, 6, 7, 8. In answer to the several matters averred in these several paragraphs touching the lawful construction and main-tenance of lines of railroad actually in existence and operated by this respondent, it is advised that said subject is not within the power of the complainant corporation in this proceeding to have adjudicated, and without waiving the benefit of this suggestion, which is made as though relief had been prayed by said complainant by reason of said averment and this respondent had pleaded thereto, yet it saith that said lines of railroad which the complainant seeks to cross at grade at four several points have been constructed under the authority of divers statutes (*inter alia*), section 17 of "an Act to incorpo-rate the Pennsylvania Railroad Company," approved April 13, 1846, P. L. 312, and supplements thereto, especially that of April 18, 1856, P. L. 447; and also of "an Act for the sale of the main line of the public works," approved May 16, 1857, P. L. 519, this respondent having been the pur-chaser thereunder and receiving a deed therefor bearing date July 31, 1857; and also of "an Act to authorize the Pennsyl-vania Railroad Company to occupy certain portions of Dela-ware avenue, in the city of Philadelphia, for railroad purposes, and make connections therewith," etc., etc., approved March 12, 1873, P. L. 253.

To the remaining paragraphs of said bill this respondent for answer saith: That it would be reasonably practicable to avoid a grade crossing by elevating the grade of the road of the complainant corporation so as to pass the road of this re-

spondent overhead at each and all of said points. The elevation of grade would not involve an additional expenditure of over $20,000 a mile for a single track, and this construction would insure an economy in use by a reduction of expenses in operation, as such elevation would also secure an overhead crossing of all streets of the city at that point. Such construction would avoid the expense of appliances for a signal service at the railroad grade crossings, and of watchmen and gates at street grade crossings. Before the Master appointed by this court plans of construction in detail can be shown in corroboration of the averments herein made.

Without this, this respondent is advised there is nothing else in said bill material to make answer unto, and prays to be hence dismissed with its costs.—

The cause was referred to *Mr. C. G. Morgan, Jr.*, as Examiner and Master, who, after hearings had, reported :—

This suit is brought under the provisions of the Act of Assembly approved June 19, 1871, P. L. 1360, entitled "An Act relating to legal proceedings by or against corporations." [sections 1 and 2 are quoted.]

It is averred by the pleadings, and testimony has been taken in support of the averments, that each of the parties to this suit is doing or is about to do that which would be an injury to the corporate rights and franchises of the other. By the plaintiff it is averred that the defendant is unlawfully obstructing and interfering with the construction of the road which the plaintiff proposes to build in the Neck, at the places where the same is to be projected across that of the defendant. By the defendant, that the plaintiff's plan for the construction of its road, crossing defendant's tracks at grade, is unnecessary, and therefore unlawful. And each of said parties moreover distinctly challenges the right of the other to construct and maintain its line of road in the Neck, and denies that it is vested with legal authority therefor, and each also denies the right of the other in this proceeding to question its authority to construct and maintain its road, although claiming for itself very strenuously this privilege.

The Master is of the opinion that it is competent for each to compel the other to show at least a *prima facie* right and au-

thority to build and maintain its line at the points where they come in contact, and where it is sought by one to carry on the construction of its road and by the other to prevent such construction, subject to the well-settled rule that if the company whose title is thus challenged produces a warrant of power granted by its act of incorporation or by articles of association, under a general law, which originally conferred upon it the right to build and maintain its road, it is not competent for any party, other than the Commonwealth herself, to assert or set up a forfeiture of such franchise: [citing, Lejee v. Railway Co., 10 Phila. 362; McCandless's App., 70 Penn. St. 210; Faust v. Railway, 3 Phila. 164; Yost v. Penn. R. Co., 29 Leg. Int. 85; Wirth v. Railway, 2 W. N. 650; Penn. R. Co.'s App., 13 W. N. 173; Peterson v. Railway, 5 Phila. 199; C., P. & A. R. Co. v. Erie, 27 Penn. St. 380.]

1. In accordance with these views, I proceed, first, to the consideration of the respective rights of the plaintiff and defendant to the roads or lines described in the bill and answer intersecting each other at the four points mentioned.

(A.) The plaintiff's title is derived from articles of association duly filed with the secretary of the Commonwealth under the general railroad law approved April 4, 1868, P. L. 62. Said articles empower plaintiff to build a railroad "from a point near the intersection of Twentieth street and Pennsylvania avenue, in the Fifteenth ward of the city of Philadelphia, to a point in the Twenty-seventh ward, near to the intersection of Fiftieth street and Bartram avenue." By section 9 of said act it is enacted that "Any company incorporated under this act shall have authority to construct such branches from its main line as it may deem necessary to increase its business and accommodate the trade and travel of the public." By section 12, that "This act shall not be so construed as to authorize the formation of street passenger railway companies to construct passenger railways under or by virtue of its provisions in any city or borough of this commonwealth, nor to authorize any corporation formed under this act to enter upon and occupy any street, lane or alley in any incorporated city in the commonwealth without the consent of such city having been first obtained."

To this line the consent of the city was not obtained, and, in March, 1884, a resolution of councils was passed, which in effect declared its disapproval of said plan, and by it the city solicitor was instructed to commence legal proceedings to prevent the construction of the proposed road, and, shortly thereafter, a bill in equity was filed by the city of Philadelphia and an answer filed by the company and the suit was referred to a Master, who, on December 8, 1884, filed a report adverse to the defendant in said suit.

Nothing further was done in the suit referred to, and shortly after the date mentioned the plaintiffs presented themselves before the councils of the city of Philadelphia, submitting for their selection various routes and plans for the said railroad. An ordinance was thereafter presented, entitled "An ordinance relative to the construction of the railroad of the Schuylkill River East Side Railroad Company, and of a branch thereof, within the city of Philadelphia," which was referred to the joint committee on railroads of councils, by whom the report in evidence was made, and on July 3, 1885, said ordinance was approved, as averred by plaintiffs in their bill.

By the terms of the ordinance, the consent of the city to the construction of the road described in plaintiff's charter was made conditional upon the acceptance by it of the route described in the ordinance for both the main road and branch which it was proposed to build. The plaintiff thereupon formally accepted the terms imposed by the ordinance and proceeded to lay out and construct both the main road and branch therein described, the main line being precisely the same as to route as that originally adopted by plaintiff, as far north as Cherry street, but differing with it north of Cherry street, between Cherry street and Pennsylvania avenue. That is, by the original plan it was proposed to build the road from a point near to and north of Cherry street, north to Newkumet street; thence by a five degrees curve to Pennsylvania avenue between Twentieth and Twenty-first streets; and by the plan approved by councils, in the ordinance referred to, the road was extended north from Cherry street along and near the east bank of the Schuylkill river to the Gas Works of the city of Philadelphia, at Twenty-fifth and Callowhill streets; and thence north along Twenty-fifth street to Pennsylvania avenue,

reaching the tracks of the Reading Railroad on Pennsylvania avenue at a point near to and west of Twenty-fifth street. The branch railroad authorized by ordinance to be laid out by the plaintiff, and at the date of the filing of the bill in this suit, in course of construction, commenced at a point on said main line north of Schuylkill avenue and Dickinson street, in the Twenty-sixth ward of the city of Philadelphia; thence south along Schuylkill avenue to Wolf street; thence east along Wolf street to Twenty-third street; thence south along Twenty-third street to Oregon street; thence east along Oregon street to Meadow street; thence north along Meadow street to the property owned by plaintiffs on the Delaware river front, at or near to and south of Reed street, with a connection also with other property of the plaintiff on the Delaware river at and fronting on Snyder street. These two properties, the one at Dickinson street and Reed street and that at Snyder avenue, are intended to be the terminals of the Schuylkill River East Side Branch Railroad on the Delaware river.

The entire length of the branch line is a little more than five miles.

The plaintiff proposes by this branch road to cross the road now maintained and operated by the defendant in the Neck, at grade, at four points, to wit, Twenty-ninth and Wolf streets, Twenty-fifth and Wolf streets, Oregon avenue and Swanson street, and Commercial avenue and Meadow street.

The defendant denies the right of the plaintiff to cross defendant's line at all, and contends:

First. That the proposed branch cannot now lawfully be constructed because the main line has not yet been completed; and,

Second. The plaintiff is without authority to build said main line, as approved by councils, because it varies from the route originally adopted by the company, and that, consequently, it has no right to build the proposed branch therefrom.

1st. Is completion of a main line of road an essential prerequisite to the lawful construction of a branch thereof?

By the act of 1868, already referred to, it is provided in section 9, "Any company incorporated under this act shall

have authority to construct such branches from its main line as it may deem necessary to increase its business and accommodate the trade and travel of the public."

What is meant by the term "main line" as used in this connection? Does it mean only a completed line? The primary object of the act of 1868 was to provide a method of incorporation of railroad companies with the same general powers and privileges which had theretofore frequently been invested in corporations of this character by special legislation. The status of a company incorporated under it to operate in the city of Philadelphia, with the assent to its construction by the municipality, is, as to the general power to construct, maintain, and operate its road, and to build branches thereto, precisely the same as that of any company incorporated under a special charter, with the power to build branches from its main line expressly given. The rights and privileges intended to be conferred by the act of 1868 upon corporations formed under it, vested in the plaintiff at the moment its articles of association were filed for record with the secretary of the Commonwealth. Thereupon the company was at once vested with the right to immediately exercise the same, except only where by the terms of the act, or by necessary implication, there is a postponement. There is no express postponement of the exercise of branching power. As to the date of its exercise, there is nothing in the language of the act to distinguish it from the other powers conferred thereby, nor can it be reasonably contended that such a postponement is to be implied either from the language used in the statute, or the purpose for which it was enacted.

The only case cited by counsel for the defendant, in support of his argument, that § 9 of the act of 1868 is only applicable to a completed main line, is Wood v. Railroad Co., 8 Phila. 94. The question decided by Judge Sharswood, on a motion to dissolve a special injunction, was, that the acts of 1861, April 23, P. L. 410, and of 1870, February 17, P. L. 31, authorize the leasing of completed railroads only, and did not warrant the transfer by lease of a mere franchise or right to build.

[The Master here quotes § 1 of the Act of April 23, 1871, P. L. 410; § 1 of the Act of February 17, 1870, P. L. 31,

and refers to the language of SHARSWOOD, J., in Wood v. Railroad Co., 8 Phila. 95.]

The phraseology of these statutes is too plain to admit of any doubt as to the meaning of the legislature. That which was to be thereafter the subject of a lease is described as a "railroad" or a "road," showing clearly that the law-makers had in view completed railroads, not mere franchises to build roads. This legislation authorizing corporations to delegate and transfer franchises and property granted by the Commonwealth, is to be strictly construed, and its scope confined to such subjects as are clearly and unequivocally indicated by the terms used.

In § 9 of the act of 1868, the legislature has avoided using the words "railroad" and "road," and selected the word "line," a word which is much more comprehensive and general in its meaning, and includes railroads laid out but not built, as well as constructed roads. Moreover, the rule of construction, to be applied to this section, differs from that applicable to the statutes referred to conferring upon railroad companies the power to lease other roads.

There is nothing in the nature of the power sought to be exercised, nor in the language of the statute, which would justify the construction contended for by the defendant. On the contrary, the language used, the manifest purpose of the statute, and the nature of the rights conferred, indicate that it was the intention of the legislature to permit companies formed under the act to build branches from main lines, as and when they might deem the same necessary for the purposes of their incorporation, whether before or after their main lines had become main roads entirely constructed and in full operation, provided the requirement of the twelfth section, as to the consent of the city, had been first complied with.

The term "branches," as used in the ninth section of the act of 1868, has been defined by the Supreme Court in McAboy's Appeal, 107 Penn. St. 548, to mean "sections" or "subdivisions" of main lines. . . . . Plaintiff's Neck branch being but a "section" of its main line, the power to build it, as respects the time of its exercise, was precisely the same as its power to build the remainder of its road.

*Second.* It is further contended that the plaintiff is without lawful authority to construct a branch line in the Neck, because their *main* line, as now laid out and under course of construction, is unlawful, in that it varies from that originally adopted by the board of directors of the company, as to the part north of Cherry street. If the main line is unlawful, that is, if authority for its construction was not conferred upon the plaintiff by its articles of association, under the act of 1868, the line proposed to be built as a branch therefrom would also be unauthorized.

Is the plaintiff's main line, from which it is proposed to extend said branch in the Neck, unauthorized?

A railroad corporation formed under the act of 1868 is vested with authority to build and operate that road only which is described in its articles of association, together with branches, etc., as provided therein. It must be conceded that a corporation formed either under a special statute or a general law is to be confined, as to termini, to the points so fixed in its charter, and, as to route, to that prescribed in the statute, if created by special legislation, or that formally and finally lawfully adopted by the board, if formed under the general law.

It will be noticed that the legislation making the city's assent necessary to the lawful construction of this road is contained in the act under which the plaintiff was incorporated; so that the right to form the corporation is coupled with the requirement of the consent of the city in the same statute, and the effect of this legislation upon the articles of association filed, is the same as if the legislature had incorporated this company by a special act, in which it was provided that no route should be selected, acquired, or used, providing for the use of the streets of Philadelphia, until the councils of the city had assented thereto.

In the city of Philadelphia v. Schuylkill River East Side R. Co., C. P. No. 2, March Term, 1884, No. 351, this section was construed by the Master to whom the suit was referred, to apply to the crossings of streets as well as to a longitudinal use of them, a view which I believe to be correct. If this be so, it follows that the assent of the city of Philadelphia was a prerequisite to the lawful adoption by the plaintiff of any route either along or across streets within its limits, and further that

the action of the board of directors of the company plaintiff in the selection of the first route, contemplating the occupation of streets not assented to by the city, was a mere nullity, and the first and only route ever lawfully adopted, was that described and consented to in the ordinance of 1885, and now in process of construction. In other words, no change has been made in the main line; the route authorized by said ordinance and now being followed is the original main line of the plaintiff. It will be noted that the termini, though not precisely the same as in the route first suggested and approved by the directors, are substantially so; the southwestern terminus is exactly the same, and the north-eastern end of the line consented to is but four city blocks or squares, or about two thousand feet, from that which was originally suggested, and to which the city refused its consent.

In the articles of association the north terminus is fixed at a point near the intersection of Twentieth street with the Philadelphia and Reading Railroad on Pennsylvania avenue; in the route first approved by the directors it is placed at a point on said Pennsylvania avenue between Twentieth and Twenty-first streets, and in that finally adopted and consented to by the city, at the point of intersection of said Pennsylvania avenue and Twenty-fifth street; the northern terminus in each being upon the Philadelphia and Reading Railroad, which was plainly the objective point, the plaintiff's main line being intended as a section of a through line from Baltimore to New York by way of Philadelphia, and, as to a portion of it, by the Philadelphia and Reading Railroad.

Either of these two routes would have been authorized under the articles of association, the requisite consent of the city having first been given thereto.

The argument of the learned counsel for the defendant that neither the corporation nor the city, separately or together, can change a route prescribed and termini fixed by the charter as a general proposition, is undoubtedly sound, and indeed could not be seriously questioned. As applied to this case, however, it begs the very question in dispute, which is: Which of the two routes referred to is the route prescribed by the charter? Clearly that approved and assented to by

the city. No other route could have been adopted under the statute.

To hold that the legislature, when the General Railroad Act of 1868 was passed, intended the mere preliminary approval of a route through a city, by the board of directors of a corporation formed under it, prior to the presentation of the same to the municipal authorities for their consent thereto, to be final and to operate as an exhaustion of the power of the corporation in this respect, so that, if the city disapprove thereof and refuse its consent, the road cannot be built at all, although it be manifest that its construction and operation would be in fact a great public benefit, and the assent of the city be proffered, upon slight changes advantageous to the public being made, would be to impute to the legislature an intention to render the statute practically nugatory so far as it purports to authorize railroad companies to enter upon and occupy the streets of an incorporated city; for it would very seldom happen that any route approved by the board of directors, as presented to the municipal authorities for their consent, would, without any modification at all, receive that consent. Such a construction of the statute is contrary to its manifest purpose, which is to permit the public, in densely populated localities, where the moneyed interests are large and property valuable, to take part in the selection of the streets to be occupied by railroad companies formed thereunder.

For the reasons stated, I am of the opinion that the plaintiff is vested with lawful authority to construct and maintain both the main line and the branch now being constructed, and to cross defendant's roads at the points specified: [Citing Frankford &c. Railway Co. v. Philadelphia, 17 W. N. 245; Dill. Mun. Corp. §§ 705, 706; Railroad v. Leavenworth, 1 Dill. 393; F. Y. & H. R. R. v. Mayor of N. Y., 1 Hilt. 563; Northern Central R. Co. v. Baltimore, 21 Md. 93; Railroad Co. v. Railroad, 32 Barb. 358; Railroad Co. v. Richmond, 6 Otto 52.]

Musser v. Railway Co., 5 Clark 466, cited by the counsel for defendant as authority for his contention that the twelfth section of the act of 1868 vested the city with a naked veto power, and that it could not give a conditional assent

requiring a change or modification of the route of the proposed road, is not in conflict with the cases cited. In that case, councils first, by ordinance duly approved, refused their assent; then subsequently, by a second ordinance, revoked their veto and substituted an assent with conditions which did not merely prescribe a change of route, but substantially affected the charter of the company; and the court held, first, that the power of councils was exhausted by the first ordinance, the city having exercised its veto power given by the Commonwealth; and, second, that the conditions coupled with the assent contained in the second ordinance were at variance with the terms of the charter, and therefore void. In the case now under consideration, that which is given to the city is simply the practical control of the selection of the route of the company within its limits between the termini fixed by the charter.

Moreover, the right of the plaintiff to construct its line in the Neck under the branching powers conferred in the act of 1868, section 9, has been distinctly recognized in the Court of Common Pleas, No. 1, in Volmer v. The Schuylkill River East Side Railroad Company, 43 Leg. Int. 66.

(B.) [The Master then proceeded, by a discussion of § 17 of the charter of the Pennsylvania R. Co., act of April 13, 1846, P. L. 312; §§ 3 and 11 of Act of May 16, 1857, P. L. 519; §§ 1 and 4, act of April 18, 1856, P. L. 447; § 1 of act of March 12, 1873, P. L. 253; § 1 of act of March 17, 1869, P. L. 12; and of the ordinances of the city of Philadelphia of October 23, 1871; May 4, 1872; November 23, 1873; and of the cases Duncan v. Pennsylvania R. Co., 7 W. N. 551, and Pennsylvania R. Co. v. Duncan, 111 Penn. St. 352, to determine that the defendant company was lawfully authorized to construct, maintain and operate its Delaware Extension.]

II. There remains to be determined the final question which relates to the method by which the plaintiff shall be permitted to cross the defendant's road at these points, bearing in mind the mandate of the statute of June 19, 1871, P. L. 1360, that the crossings shall not be at grade if it be reasonably practicable to cross in any other way.

Is it reasonably practicable for the plaintiff to intersect the defendant's road at these points without crossing at grade? The rule by which the Master is to be guided in determining this question of fact has been clearly stated and defined in numerous cases: [P. & C. R. Co. v. S. W. Penn. R. Co., 77 Penn. St. 173; and Northern Central R. Co.'s App., 103 Idem, 621; B. & P. R. Co. v. P., W. & B. R. Co., 42 Leg. Int. 425, discussed.]

Under these cases, in order to determine whether it is reasonably practicable for the plaintiff to avoid crossing defendant's road at grade, at the points of intersection, the Master is called upon to consider :—

The nature and character of the locality through which it is proposed to construct and operate the plaintiff's road, and of the business which will probably be carried on by it.

The cost and the expense of building the road overhead or underground, at the points of intersection referred to, as compared with the cost and expense of grade crossings, and the practicability of successfully operating a road so raised or depressed.

The nature and extent of the injury which will be inflicted upon defendant in the way of interference to the operation of its road by grade crossings at said points ; and,

The effect upon the safety and convenience of the public of grade crossings at these points.

The plaintiff, assuming the burden imposed by the act of 1871, showed that the ground to be traversed by its road is flat and well suited for the location, construction and operation of a railroad at the natural surface grade ; that the nature of the business which is now being transacted by the defendant, and which would probably be carried on by the plaintiff, is mainly a freight traffic ; that crossings at grade would retard to some extent, and delay the movement of defendant's trains, but would not inflict serious injury or loss upon it; that the adoption of an elevated or a sunken or depressed line at the crossings referred to would increase very greatly the cost of the right of way for the road or land damages, adding to the amount of such damages from $100,000 to $150,000 at least; and that the public, as represented by the councils of the city

of Philadelphia, have assented to the building of the plaintiff's road at grade at these crossings, and have thus disposed of the question of the effect of the same upon the public safety and convenience.

[The evidence and exhibits produced by the parties upon both sides were then reviewed and examined by the Master resulting in his rejection of the defendant's plan of a depressed line at the Schuylkill crossings and an elevated road at the Deleware crossings, on the grounds that (1) if such a construction were adopted, connections and sidings would be both difficult and expensive as to construction and maintenance and (2) it would constitute a breach of a substantive condition of the right of way and release of damages by property owners, and would render the plaintiff liable for damages both for land taken and consequential injuries, and (3) would greatly increase the mere expense of construction of plaintiff's road, which expense was found, with the cost of maintenance capitalized, (embracing a recommendation as sufficient of the signal apparatus of the Union Switch and Signal Co. instead of the Saxby & Farmer system recommended by the defendant's expert testimony,) to be as follows:]

Total expense of original construction in accordance with defendant's plan, . . . . . . . $277,167 00
Annual cost of maintenance capitalized, . . . . . . . . . . 166,666 00

Total, . . . . . . . . . . . . . $443,833 00
Total expense of original construction in accordance with plaintiff's plan, . . . . . . . . . . $26,362 75
Annual cost of maintenance capitalized, . . . . . . . . . . 93,600 00

Total, . . . . . . . . . . . . . 119,962 75

A difference between the plans of, . . . . . . $325,870 25

I have omitted altogether from my consideration of the case the element of difficulty of access to and exit from plaintiff's terminals at Snyder street and Dickinson street, so far as that can be regarded as an element distinct from the method of ap-

proach thereto by an elevated road. If, in other respects, the elevated road were not seriously objectionable, and I had been satisfied from the testimony that the only serious injury or expense which such a method of construction would inflict upon plaintiff would be that arising from the difficulty of connecting with their terminals, I should have found for the defendant upon the issue presented, as this would be largely due to the fact that both of these terminals are small, a defect which might easily be cured by a larger expenditure of money by the plaintiff in the purchase of additional territory.

As has already been stated, the business to be carried on by both these roads in the Neck is mainly a freight business, which requires such a construction as will enable them to afford to property-owners along their lines facilities for connections by means of sidings and turnouts. If the elevated road proposed by defendant be adopted, its effect would be to deprive both the plaintiff and the property-owners of these facilities for traffic, and, moreover, would be in direct contravention of the terms of the assent of the city of Philadelphia to the construction of the road and the use of the streets, which is made conditional upon the adoption of a grade or surface road throughout the entire line, and, besides, the construction and operation of plaintiff's road in accordance with this plan would also enormously increase the first cost or construction account.

III. To summarize upon the whole case I find:—

*First.*—The plaintiff and defendant are vested with lawful authority for the construction, maintenance, and operation of their respective roads in the Neck; intersecting at the points mentioned in the bill and answer.

*Second.*—That the business to be carried on over both roads is mainly freight traffic.

*Third.*—That it is essential to a profitable operation of plaintiff's road that it be built as near as possible to the natural surface grade of the land so as to afford property-owners along its line practical facilities for connecting therewith by sidings, turnouts, etc.

*Fourth.*—That the avoidance of grade crossings by the plaintiff, and the construction of the road at certain points

depressed and at others elevated, as suggested by the defendant, would deprive plaintiff of the facilities for connection with properties along its line essential to its successful and profitable operation, and would render the road comparatively useless and profitless.

*Fifth.*—That the expense of construction of plaintiff's road in accordance with defendant's plan would be quite three times as great as that required for its construction in accordance with that of the plaintiff with crossings at grade.

*Sixth.*—That the construction and operation of the plaintiff's line, in accordance with its plan as a surface road crossing defendant's road at grade at the four points mentioned, would not seriously injure the defendant, although it would somewhat impede or delay the movement of its trains, but not to an extent which warrants the imposition of the enormous increase of cost of construction which the plan submitted by the defendant would call for.

*Seventh.*—That the plan of construction of plaintiff's road proposed by it has been accepted and consented to by the city of Philadelphia, which has thus authoritatively disposed of the question of its effect upon the public safety and convenience.

And I conclude, that it is not reasonably practicable for the plaintiff to avoid crossing defendant's road at the points specified at grade, and respectfully report the following decree:

1. That the plaintiff company shall have the right to construct and operate its road across the roadway and tracks of defendant company at grade at the four points of intersection specified on the location proposed by the plaintiff company, subject to the payment hereafter, when legally ascertained, of such damages as the defendant may thereby sustain.

2. That such crossings be constructed by the plaintiff at its own cost under the supervision of the chief engineer of the defendant or other person authorized to act for the company, the representative of the defendant to be appointed within ten days after request to this effect made by the plaintiff.

3. That the said crossings be kept in good condition by the plaintiff as to repairs and renewals, and at its expense. In case of the failure of the plaintiff company, upon notice from the defendant, for the period of one week thereafter to make such

repairs and renewals as may be required, the same may be made by the defendant company, and the expense thereof recovered by it from the plaintiff.

4. The plaintiff shall erect and maintain suitable signal apparatus for each of the crossings referred to; that is, they shall maintain signal apparatus of the nature and character of that described and set out in Exhibits 12 and 13, C. E. M., Jr., for the crossings at Twenty-ninth and Twenty-fifth and Wolf streets, one signal apparatus of the character set forth in said exhibits for both of these crossings; and at each of the crossings in the eastern section of the road, to wit, that at Oregon and Swanson streets and Commercial avenue and Meadow street, a complete apparatus of the same character, with signal towers at each crossing; and that at each of the four crossings they shall keep a competent and careful watchman; the entire costs and expenses of said apparatus and the wages of the watchman to be borne by the plaintiff. In the use and operation of the road, when two trains or engines, one being that of plaintiff and the other that of the defendant, approach any of said points of crossing at the same time, the engine, train, or cars running upon defendant's road shall have the right of way or right to cross first, and the engines, cars, or trains of the plaintiff shall invariably come to a full stop before crossing defendant's tracks, and shall not proceed to cross until the proper signal shall have been given.

5. That the injunction prayed for be granted upon the filing by the plaintiff of a bond in the sum of $40,000 with sureties to be approved by the court, conditioned for the payment of such damages as the defendant may sustain by reason of the plaintiff constructing its railroad at grade across the roadway and tracks of the defendant at said points.—

6. That the costs of this suit be paid by the plaintiff.

To the conclusions and decree reported by the Master the plaintiff excepted and, *inter alia*, to the proposed decree, in so far as it provided that the engines, cars and trains of the plaintiff should invariably come to a full stop before crossing defendant's tracks, and should not proceed until the proper signal was given; and also in so far as it provided that the costs of the suit be paid by the plaintiff.

Exceptions.

The defendant excepted to the report, that the Master had erred *inter alia*, (1) in holding that the main line of the plaintiff is that assented to by the city instead of that for which the charter was granted; (2) in holding that the plaintiff was vested with legal authority to construct a " branch line " before the " main line " was constructed; and (3) in not reporting that it was practicable to avoid each grade crossing.

In a supplementary report upon these exceptions from both sides, the Master adhered to his conclusions set forth in the report both as to the law and facts, saying *inter alia :*—

With reference to the plaintiff's exception to so much of the decree recommended as imposed the entire costs of the suit upon that company: The act of Assembly of June 19, 1871, positively prohibits crossings at grade in all cases where it is reasonably practicable to avoid them, and imposes upon the company desiring to cross at grade the road of another company the burden of satisfying the court that it is not reasonably practicable for it to avoid crossing in this manner. This is made a condition precedent to the right so to cross, and the entire expense of its performance should be borne by the party upon whom it is imposed. In the opinion of the Master, it was the intention of the legislature, manifest throughout the statute, to impose upon a crossing road all expenses incident to the grade crossing, and to relieve the company whose road is to be crossed entirely therefrom. Such was the decree in the Northern Cent. R. Co.'s App., 103 Penn. St. 621.—

The exceptions were then argued in the court below, and the court confirmed the report, and entered the foregoing decree recommended by the Master ; and from this action the defendant company took this appeal, assigning as error :

1. That the court below erred in sustaining the Master that there was valid authority vested in the appellee to construct the branch line of railroad.

2. The court below erred in sustaining the Master that as the plan of the construction of the road of appellee has been accepted and consented to by the city of Philadelphia, that this authoritatively disposes of the question of its effect upon the public safety and convenience.

3. The court below erred in sustaining the Master that it is

not ·reasonably practicable to avoid crossing the roads of the appellant at grade at the points specified.

4. The court below erred in sustaining the Master that a grade of signal service should be established not of the best to guard the several allowed crossings.

5. The court below erred in entering the final decree of December 31, 1886.

*Mr. David W. Sellers*, for the appellant.

1. If it be conceded that a *branch* line of railroad may be constructed contemporaneously with the main line, yet there must be an authorized and valid main line.

Not only is the complainant's main line incomplete, but there is no valid authority for its construction. Under § 12 of the act of 1868, no main line of road can be constructed in this city without its authority. It is conceded that the city has never consented to the construction of such a main line of complainant's road as is written in its charter. In other words, this railway was incorporated with given termini which are from the river Schuylkill up along the east bank to Cherry street and thus passing in a northeasterly direction to Twentieth and Pennsylvania avenue. It has obtained the consent of the city to the construction of the line passing beyond Cherry street to Twenty-fifth, up Twenty-fifth to Pennsylvania avenue, and thence westwardly to a point about Thirtieth street, and it stands to-day admitted that not only has the city not consented to the construction of a main line between the termini indicated by the charter, but that this complainant corporation in point of fact has abandoned the construction of so much of its main line as is at a point near the Schuylkill river and Cherry street, running northeastwardly to Twentieth and Pennsylvania avenue.

No case can be found in Pennsylvania in which a special statute prescribed given termini, that any authority is found in the corporation to depart from either of the termini, or to substitute others, and the allegation to that extent is wholly unfounded. The cases in Pennsylvania are the reverse : Western Penn. R. Co.'s App., 99 Penn. St. 155; Commonwealth v. Erie & N. E. R. Co., 27 Idem, 399; Plank Road Co. v. Arndt, 31 Idem, 317. The act of June 1, 1883, P. L. 57,

confirms the idea that the discretion in the corporation is never to be used to substitute or change termini.

It was contended in the court below, that because the city is vested with the power to consent, it may couple its consent with such conditions as oblige a corporation to do what otherwise it has not the charter power to do, and certain *dicta* of courts in the West were cited. But in this state some consideration has been given to the powers of councils where their consent to construction has been a prerequisite : Faust v. Railway, 3 Phila. 164; Musser v. Railway, 5 Clark 466, 5 Am. L. R., O. S., 284; Pittsburgh City's App., 18 W. N. 537.

It is the duty of this court to examine, inquire and ascertain whether the appellee does in fact possess the right to build the branch road in question: § 1, act of June 19, 1871, P. L. 1360 ; which right is maintained in Lejee v. Railway, 10 Phila. 362; McCandless's App., 70 Penn. St. 210; and in Edgwood Railroad Co.'s App., 79 Idem, 257.

2. The finding of the Master that, as the plan of the construction of the road of the appellee has been accepted and consented to by the city, this authoritatively disposes of the question of its effect upon the public safety and convenience, involves the proposition that the power to consent given to the city in the act of 1868 can be used to repeal the act of 1871, which seems to be absurd : P. & C. R. Co. v. S. W. Penn. R. Co., 77 Penn. St. 184.

3. The crossings at grade on the Schuylkill could be prevented without affecting those on the Delaware, and the converse is equally true.

In the answer it was suggested that an overhead crossing at all points would be reasonably practicable, involving an additional expenditure of not over $20,000 a mile for a single track ; this construction insuring an economy in use by a reduction of expenses in operation and avoiding appliances for a signal service. But when appellant's plan produced in evidence was submitted to appellee's engineering department, it was discovered that the Schuylkill crossings could be more easily avoided by a simple prolongation of the grade adopted by the appellee than by the construction of an elevated road at these points.

In commenting on the whole evidence as to cost the Master by substituting a cheaper signal service in favor of the appel-

lee, finds the fact to be that there is an excess of cost of $36,231.60 for construction and maintenance to avoid these grade crossings.

When it is remembered that the so-called branch road of the appellee is as much the main line of the B. & O. Railroad into Philadelphia as is its technically-called main line along the east side of the river Schuylkill, it seems scarcely credible that with such a small expenditure as that the court below, in the language of this court in Railroad v. Railway, 77 Penn. St. 184, "recognized that the appellant as the first occupant had rights superior to these of the appellee."

As to the crossings at Swanson street and Commercial avenue on the Delaware; on these, a plan was suggested of an elevated road about 6600 feet in length, costing for construction, by appellee's testimony, $100,000, being a difference of first cost in favor of surface road of $56,990. There is testimony that the cost would exceed $100,000. To avoid dispute as to this an offer was made on behalf of appellant, before the case was considered by the Master, to construct the entire line of road according to this plan for $100,000 and deliver it to the appellee ready for the ties and rails.

The testimony of the appellee is to the point that to avoid expense it is necessary to interfere with the previously granted franchise of the appellant. The best criticism of this doctrine of necessity may be found in the remarks of Mr. Justice GORDON in Pennsylvania R. Co.'s App., 93 Penn. St. 159.

4. The appellant contended below that if the appellee was allowed to cross as it desired, an interlocking system should be imposed on it. The Master looked at the past rather than to the future. Finding in existence signal appliances which were concededly below the standard of the art now, he applied those rather than decree the highest standard at this time.

Attention is called to the testimony of Mr. H. S. Cox, Mr. Getchell, Mr. Gucker, Mr. Wm. J. Latta and Mr. Richards.

5. This fifth assignment is wholly dependent on the view this court may take on the preceding assignments, and requires no special discussion.

*Mr. Thomas Hart, Jr.*, (with whom was *Mr. Lewis C. Cassidy*), for the appellee.

There are three main subjects in this case.

*First.* That of the plaintiff's title or power to build the Delaware Branch Railroad.

*Second.* That of the defendant's title to maintain the lines of railroad which the said branch crosses.

*Third.* That of the crossings themselves.

The assignments of error have reference to the first and third subjects. The Master has decided in favor of the defendant upon the second head, but as he reported in favor of permitting the crossings as proposed by the plaintiff, the latter need not contest the right generally of the defendant with regard to its own lines.

I. 1. The power of the plaintiff to build the railroad in question was attacked upon several grounds, only one of which however, seems now to be urged in the appellant's paper-book, namely, that there has been a change in one of the termini of the main line of plaintiff's road, which makes both the whole line of the main road and of the branch illegal.

In Vollmer's Appeal, just decided, 19 W. N. 133, the right of the plaintiff to build the same branch railroad was upheld; but, in all the litigation which has harassed the plaintiff, no one has before said that the main line itself, now completed at a cost of millions of dollars, in the way that the citizens of Philadelphia demanded, is a wholly unlawful structure.

The company was incorporated to build a railroad from a point near the intersection of Twentieth street and Pennsylvania avenue in the Fifteenth ward to a point in the Twenty-seventh ward near to the intersection of Fiftieth street and Bartram avenue; and there has been no change of terminus at all, under a fair and proper construction of the charter and the authority of the city arising out of § 12 of the Act of April 4, 1868, P. L. 62. The authorities sustain this position: Parke's Appeal, 64 Penn. St. 137; Fall River Iron Works Co. v. Railroad, 5 Allen 221.

2. But even supposing that the words "near Twentieth street" did not comprehend a point near Twenty-fifth street, the case presented is not that of doing an illegal act, the building of any railroad which the company had not a right to build, but simply one of a failure to go to a point nearer Twentieth street. There has been a mere neglect to go to a

point at or near Twentieth street in consequence of the refusal of the city to consent to that part of the route; and, even if this might be made a basis of proceeding by the Commonwealth for a forfeiture, this defendant cannot therefore allege that the plaintiff has no power to build something else, the Delaware branch.

In that aspect the case is simply that of a company building an entirely lawful railroad, but which is prevented by a power in accordance with an act of the legislature from building another part as originally intended.

Mr. Sellers' argument upon this head has gone upon the assumption that, as there has been no valid consent—that is, as there has been no consent of the city to the whole of our original line—all that we are doing now is invalid.

But we deny that the effect of a failure to get the consent of the city at all, which is the strongest way it can be put for the other side, is to make the road we are building unlawful: 5 Am. & Eng. R. Cases, 253; C. & W. J. R. Co. v. Dunbar, 100 Ill. 110; Lejee v. Railroad Co., 10 Phila. 362; West. Penn. R. Co.'s App., 104 Penn. St. 399.

3. There is nothing in the change of the route to Twenty-fifth street; it was a change entirely within the powers of the company: 1 Rohrer Railroads, 274–7 and cases in notes; Gear v. Dubuque, 20 Iowa 529; Ex. parte S. C. R. Co. 2 Rich. (Law) 434; M. & T. R. Co. v. Delancy, 42 Miss. 555; U. P. R. Co. v. A. T. & S. R. Co., 5 Amer. & Eng. R. Cases 389; Roberts v. Railroad Co., 1 Phila. 262; Caley v. Railroad Co., 80 Penn. St. 363; Beal v. Railroad Co., 86 Idem, 509; § 1 act of March 17, 1869, P. L. 12.

4. The next view is, that the assent of the city was a prerequisite to the adoption of any route, and that the first and only route lawfully adopted was that described and consented to in the ordinance of 1885, and upon which the railroad has now been constructed in accordance therewith. The views of the learned Master upon this point are strongly expressed and are sustained by the authorities : Pacific R. Co. v. Leavenworth, 1 Dill. 393; N. Y. & H. R. R. v. Mayor of N. Y., 1 Hilt. 563; Northern Central R. Co. v. Baltimore, 21 Md. 93; B. Central R. Co. v. B. City R. Co., 32 Barb. 358; Slatter v. Railroad, 29 Iowa 148; Tate v. Railroad Co. 7 Ind. 480; P. & B. Pass. R.

Co. v. Birmingham, 51 Penn. St. 41; West Penn. R. Co.'s App., 99 Idem 155; McAboy's App., 107 Idem 548; Pittsburgh City's App., 18 W. N. 537.

5. But there is a solution of this whole question in the Act of June 9, 1874, P. L. 282, authorizing municipal corporations to contract with companies for change of location or grade.

The Act is not confined to constructed railroads. The reason is greater as to one not built: Mercer v. Railroad Co., 36 Penn. St. 99; West. Penn. R. Co.'s App., 99 Idem 155; McAboy's App., 107 Idem 548; Volmer's App., 19 W. N. 133. As to the question raised upon the title of the ordinance, see Dewhurst v. Allegheny, 95 Penn. St. 437.

II. In the summary made by the Master, he found that the plan of construction of plaintiff's road proposed by it has been accepted and consented to by the city of Philadelphia, which thus authoritatively disposed of the question of its effect upon the public safety and convenience; but in no part of his report has he considered this action by the city as conclusive of the rights of the parties upon the subject of the avoidance of the grade crossings. In no part of the master's report is any such proposition affirmed as that stated by the appellant's counsel, that the above finding "involves the proposition that the power to consent given to the city in the act of 1868 can be used to repeal the act of 1871."

The case cited by the appellant's counsel, P. & C. R. Co. v. S. W. Pa. R. Co., 77 Penn. St. 173, was merely to the effect that the right to cross other railroads at grade, given by the act of 1868, was subject to the act of 1871. There is no doubt about this. Plaintiff's counsel did not contend to the contrary, and certainly the Master did not otherwise report.

III. All the authorities upon the subject of the interpretation of the Act of 1871 are given in the Master's report.

Upon an examination of the testimony it is submitted that the Master was clearly right in his finding upon the subject of these crossings. It is certain that the appellant has shown nothing to convict him of "palpable error" in this regard: Balt. & C. V. Ex. Co.'s App., 10 W. N. 530; Northern C. R. Co.'s App., 103 Penn. St. 621.

IV. After a careful investigation the Master has expressly defined what is a "suitable" signal apparatus, and we submit that

there is nothing in any part of the testimony to convict him of clear error.

More than this, the decree carefully provides for the precedence of the appellant's trains, and the trains of the appellee shall "invariably come to a full stop before crossing defendant's tracks, and shall not proceed to cross until the proper signal shall have been given."

V. This assignment is not separately considered, and it is submitted that none of the preceding assignments of error should be sustained.

PER CURIAM:

The policy of the law to discourage steam railroads from crossing each other on the same grade, is distinctly ruled in Pittsburgh & Connellsville Railroad Co. v. Southwest Pennsylvania Railway Co., 77 Penn. St. 173, and in Northern Central Railway Co.'s Appeal, 103 Idem 621. As, however, crossing at grade is not absolutely prohibited, each case must be determined on its own merits.

In the present case, the Master found *inter alia* that the proposed crossing is essentially necessary for the successful and profitable operation of the appellee's road and does not seriously injure the appellant although it does somewhat impede the movement of the latter's trains. He further found that it is not reasonably practicable to avoid crossing the road of the appellant at grade at the points specified, and that the municipal authorities of the City of Philadelphia have consented to the proposed plan of construction, thereby recognizing that it is not unduly dangerous to the public safety. This finding was confirmed by the court below.

An examination of the evidence fails to convict the Master of error in his conclusions. In view of the fact that the crossings are in an outlying portion of the city and where through passenger trains are not likely to be moved, we discover no sufficient cause for prohibiting a crossing at grade. The decree imposes on the appellee the duty of erecting and maintaining suitable signal apparatus for each of the crossings, and otherwise appears to provide for due care in guarding and protecting against injury at the crossings.

Decree affirmed and appeal dismissed at the costs of the appellant.